**MOBILE TOWING COMPANY, Plaintiff,**

v.

**THE M/V JANITA et al., Defendants.**

**Civ. A. No. 5440–69–T.**

United States District Court,
S. D. Alabama, S. D.

April 21, 1972.

Rae M. Crowe, T. K. Jackson, Jr., T. K. Jackson, III, Mobile, Ala., for plaintiff.

George F. Wood, Sidney H. Schell, Mobile, Ala., for defendants.

### ORDER

DANIEL HOLCOMBE THOMAS, Senior District Judge.

This cause came before the Court for trial without jury on November 16, 17, 18 and 19, 1971, and the Court after hearing oral argument by attorneys on behalf of both parties, and after having examined all documents filed and exhibits introduced at trial as evidence, along with all other evidence introduced at trial, and after studying post-trial briefs, makes the following Findings of Fact and Conclusions of Law.

### FINDINGS OF FACT

1. This is a suit filed by the plaintiff Mobile Towing Company against the M/V JANITA and others to recover as

damages all losses incurred by the plaintiff as the result of the capsizing and sinking of the tug MARVIN MOSTELLAR, owned by the plaintiff. The sinking is alleged to have occurred when the tug became involved in a tripping situation due to negligence on the part of the M/V JANITA on the morning of April 11, 1969 in the Mobile harbor in Mobile, Alabama.[1]

2. On the morning in question, the M/V JANITA was moored bow in alongside the grain elevator in a slip on the West side of Mobile River at the Alabama State Docks in the Port of Mobile. The river runs in a North-South direction, the slip in an East-West direction. The previous afternoon, the vessel's agents had requested a harbor pilot from the Alabama State Docks and two tugs from Mobile Towing Company to shift the vessel from the grain elevator to anchorage No. 2 which is located alongside the East bank of the Mobile River immediately South of the Bankhead Tunnel tubes and approximately one and one-half miles downriver from the grain elevator at the State Docks. The shift was to begin at 6:00 A.M. on the morning of April 11; the vessel was partially loaded having a draft of 20 feet forward and 30 feet aft.

3. At approximately 6:00 A.M. on the 11th, a harbor pilot, Capt. Gray, reported to the JANITA as did the two tugs requested from Mobile Towing Company, the M/V MARVIN MOSTELLAR and the M/V AUSTILL PHARR. There was a dense fog overlying the harbor and the master of the JANITA determined that the shift should be delayed until the weather conditions improved.[2] Thereafter, the visibility improved somewhat in the immediate vicinity where the vessel was moored and around 7:20 A.M., the JANITA, with the pilot on her bridge, began her downstream shift assisted by the two tugs.[3] Although the visibility improved slightly where the JANITA was moored, dense fog was still prevalent in patches over the river along the JANITA'S intended route and in the vicinity of anchorage No. 2.

4. As the JANITA made her way downstream, the pilot directed her movement by ordering the use of her engines on occasion and by directing maneuvers of the two assisting tugs as needed.[4]

1. The M/V JANITA, a large modern grain carrier of Norwegian registry, is approximately 605 feet in length with an 85½ foot beam, displacing 41,000 tons when fully loaded and is equipped with engines capable of mounting approximately 11,200 horsepower.

The tug MARVIN MOSTELLAR was originally constructed at the Port of Houston Iron Works around 1944 for use by the Army Transportation Corps as an ST-type tug. In January of 1968, the MOSTELLAR underwent various renovation and design alterations at the Southern Shipbuilding Works. According to the testimony of Arthur Sargent, an expert naval architect in charge of the repairing of the MOSTELLAR, the length of the MOSTELLAR at the end of the repairs and at the time she sank was 85 feet, the beam 23 feet and the weight 230 tons. A GM 567 AC engine replaced the old Clark MB 6 800 horsepower engine and brought the horsepower of the MOSTELLAR up to 1600 horsepower, or, approximately double what she originally had.

2. There is no dispute in the testimony that at the time the shift was to have originally begun, the fog in the river area was prohibitively dense; and, that it was the master of the JANITA who determined when the shift was to begin. The pilot of the JANITA, determined that the shift was to be undertaken by moving the JANITA stern first downstream.

3. The pilot testified that he positioned the tug MOSTELLAR off the stern of the JANITA to take an eight inch nylon line, approximately 200 feet in length. This line was made fast to the JANITA at her center stern chock by figure eight rounds, and to the tug MOSTELLAR in her pelican hook located center aft of her deckhouse. The tug AUSTILL PHARR was directed to position herself at the bow of the JANITA without a line to her. The PHARR was assigned the task of shifting from port to starboard on the bow of the JANITA as directed by the pilot to forestall sheering during the shift downstream.

4. When asked why he decided to shift the JANITA downstream stern first, Captain

The tug MOSTELLAR was ordered to pull on the stern line with her engines at full ahead. The tug PHARR was positioned without a line on first one side of the bow and then the other. At one point in the shift, the tug MOSTELLAR signaled the JANITA to put more turns on the stern line to stop the line from slipping. This was done.

5. When the JANITA reached the vicinity of anchorage No. 2 she experienced difficulty in locating the boundaries of the anchorage;[5] she had moved downstream beyond the point at which the anchors should have been dropped and she was not close enough to the East bank.[6] The pilot ordered the tug PHARR to butt against the port bow of the JANITA and ordered the tug MOSTELLAR to pull easterly on the stern line.[7] The JANITA'S engines were put at half ahead in order to kill her sternway and to move her upstream to the point where the anchors should be dropped.

6. As the JANITA was being moved toward the East bank by the two tugs, the pilot requested assistance from a "line-handling" launch operated by Richard L. Rogers. The primary function of the launch operated by Rogers was to take the vessel's mooring lines ashore and to help spot the boundaries of the anchorage if and when called upon to do so. Gray ordered the MOSTELLAR to slow down on her engines which had been running full ahead to pull the vessel toward the East bank, ostensibly to allow the launch to take the stern line.[8] The pilot further testified that immedi-

---

Gray stated that at the time and under the circumstances he thought stern first would be the safest way. In order to make the shift bow first, the JANITA would be required to make two complete turns in the river, once coming out of the grain elevator and once at the No. 2 anchorage. When asked if he thought moving a vessel stern first was a proper procedure, Captain Gray responded that although it might be considered unusual, it is not necessarily improper.

Captain Percy Manders, a senior harbor pilot in the Mobile harbor with 24 years experience, who was present in the harbor on the morning in question, stated that under the circumstances he would have moved the JANITA bow first downstream, but that it could be proper to move stern first. The difficulty with moving stern first is twofold stated Captain Manders: first, if the stern draft is deeper than the bow draft, the bow of the vessel will tend to "sheer"; second, the rudder of the vessel is of no value. Manders also stated in his opinion it was too foggy to have attempted to shift the vessel under existing weather conditions.

5. The pilot stated "The fog was hindering my visibility to see landmarks". The Master of the JANITA said: "sometimes we couldn't see the bank."

6. The bow of the JANITA sheered sharply toward the East bank just North of the anchorage. The tug PHARR was positioned on the starboard bow of the JANITA and her stern was caused to go ashore at the time of the sharp eastward sheer of the bow. To break the sheer, the MOSTELLAR was ordered to pull westward on the stern line and the PHARR took a 75 foot line off the port bow. The JANITA was thereafter somewhat athwart river at the time she reached the anchorage area.

7. When asked why he had ordered the MOSTELLAR to pull the JANITA to the East bank rather than butt her in on the port quarter Captain Gray stated that he thought it was better to pull than push.

8. The pilot testified that he thought that the JANITA was relatively parallel to the river and that both tugs could have let go their lines with no danger ensuing to the JANITA. Rogers, who operated the launch, testified that Gray wanted to move upstream to drop the anchors and that the visibility was poor to none at the anchorage. Rogers further testified that he thought the stern of the Janita was close enough to the East bank to run the line so he took his launch down the entire length of the starboard side of the JANITA, past the bow of the MOSTELLAR and then looped back to take the line. Rogers also testified that due to the proximity of the mud bank off the East bank he did not have enough room to turn around without completely getting away from a position between the ship, the tug and the East bank. When Rogers got back to the MOSTELLAR, he stated that he saw wheel wash from the JANITA coming over the bulwarks of the MOSTELLAR'S port side.

ately after he told the MOSTELLAR to slow down her engines he heard a series of whistle blasts which indicated to him that the MOSTELLAR was in trouble. The visibility, or rather the lack of it, prevented those on the bridge of the JANITA from sooner observing the MO-STELLAR'S dangerous predicament which had been initiated by the JANI-TA'S forward movement upstream. Then, suddenly realizing that the MO-STELLAR was in a "tripping" situation, the pilot ordered the engines on the JANITA stopped.[9] The JANITA'S engines had been employed to kill the sternway mounted by the JANITA as she made her way downstream and to move the vessel upstream to the intended spot where the anchors were to be dropped. Both the pilot and the master ordered members of the crew on the stern of the ship to release the tow line. Attempts were then made by the crewmen aboard the JANITA to let go the stern line,[10] but to no avail. Within a three minute period, the tug MOSTEL-LAR was pulled over on her port side and subsequently sank to the stern of the JANITA. As the MOSTELLAR was pulled over, she was dragged directly astern of the JANITA and sank with the stern line taut and still made fast to

9. The Captain of the MOSTELLAR was Dewey Stanford, an able and seasoned tug captain. He testified that he knew the JANITA had sternway on and that she would probably utilize her engines to kill it and that when he noticed wheel wash from the JANITA he did not become alarmed or consider the tug in a dangerous position. Pilot Gray stated that when the JANITA reached the No. 2 anchorage area it had some sternway on and that the JANITA came half-ahead on her engines, killed the sternway and put on some headway. Stanford testified that it was only when he noticed that the JANITA was putting on headway and that the MOSTELLAR was being increasingly pulled over did he become alarmed.

10. The reasons for the stern line never having been released from either the MOSTELLAR or the JANITA make two interesting stories. The line itself was eight inches in diameter and made of a synthetic fiber. The line has a characteristic known to those aboard both vessels, viz., when under strain it will snap in an elastic manner when only slightly cut, and, presents an extremely dangerous situation for anyone in the vicinity. The master of the JANITA, Captain Tarranger, testified that when the JANITA got to the anchorage area that she had sternway on and that a signal was given to go half-ahead on the engines. He stated that he then saw the MOSTELLAR was capsizing and yelled down from the bridge to "let go the line". Attempts were then made to take turns off the line from the stern chock but it had too many turns on it to release it by hand before the MOSTELLAR was pulled over. The members of the crew on the JANITA did not attempt to cut the line for two reasons: first, there was no axe available, and second, the bosun told them to stay clear of the line. From the testimony given, the Court cannot find as a matter of fact that it was negligent not to have an axe available aboard the JANITA with which to cut the line. And, as paradoxical as it turned out, it was the MOSTELLAR which requested more turns be put on the line.

The line was not let go from the MOSTELLAR for the following reasons: first, testimony was given by the MOS-TELLAR witnesses that the "pelican hook" to which the line had been made was a device which could not be released with safety when the line in it came under a strong strain. In sum, the defendant asserted that the pelican hook is a "quick release" mechanism especially useful for the very situation the MOSTEL-LAR was caught in; whereas the plaintiff contended that the pelican hook is nothing more than an "easy release" mechanism, not capable of being useful in the situation that developed on that morning. Second, Paul Reed, the deckhand on board the MOSTELLAR who was assigned to stand by to let go the line testified that the rapidity of the listing of the MOSTELLAR together with the amount of wheel wash coming over the MOSTELLAR'S deck made it physically impossible to let go the pelican hook even if he could have gotten to it. The Court feels that under the circumstances it was more dangerous to those aboard the MOSTELLAR to "cut" the line than to those aboard the JANITA, and hence finds that it was not negligence on the part of the MOSTELLAR in not cutting the line or trying to release the line from the pelican hook.

both vessels. Fortunately all hands on the tug were rescued.

7. A great deal of evidence was produced concerning the seaworthiness and stability characteristics of the tug MO-STELLAR by expert witnesses acting for both defendant and plaintiff. The Court finds that the MOSTELLAR was sufficiently stable and sufficiently seaworthy for her intended use as a harbor tug in the port of Mobile.

## CONCLUSIONS OF LAW

1. The Court has jurisdiction over this subject matter pursuant to 28 U.S.C. Section 1333.

 2. The proximate cause of the sinking of the tug MARVIN MOSTEL-LAR was the decision to shift the vessel JANITA in the face of severe weather conditions which caused or contributed to all of the factors leading up to and resulting in the capsizing of the tug.[11] Alcoa Steamship Co. v. The John T. Walsh and Mobile Towing & Wrecking Co., 176 F.Supp. 817, U.S.D.C., S.D.Ala., 1959; The Quoque, 35 F.2d 683 (2d Cir. 1929). The responsibility for this decision was the master's, hence the vessel itself, must answer.[12]

3. Resolution of the issues concerning the decisions on the part of the pilot of the JANITA to move the vessel stern first and to have the tug MOSTELLAR pull the vessel to the East bank rather than butt it in, is not necessary to determine liabilities in this case; nor is it necessary to determine if there was a duty owed by the JANITA to the MO-STELLAR to notify the latter of her intention to move upstream.[13]

4. The tug MOSTELLAR was not guilty of contributing fault.[14]

Order and Judgment to be entered in accordance herewith.

---

11. Testimony given at trial concerning the density of the fog is so convincing that the Court feels that the visibility did not reach a safe operable distance for shifting a vessel the size of the JANITA in Mobile River.

12. There was no compelling reason that the shifting maneuver could not have been delayed until visibility was much better than it was.

13. The MOSTELLAR asserted that, according to customary practice, she should have been notified by those in charge of the maneuver on the bridge of the JANITA that the JANITA was not only going to use her engines to kill her sternway but would also keep her engines going ahead to move upstream; the pilot of the JANITA disagreed with the contention that such was the customary practice and maintained that the Master

of the tug should have foreseen that it would probably be necessary to move the vessel upstream.

14. There was testimony elicited on behalf of the defendant to the effect that the decisions on the part of the captain of the MOSTELLAR contributed to the demise of the tug. Without going into the detailed testimony concerning the time that elapsed when the captain of the tug first noticed his vessel was endangered and when he abandoned the tug, the Court is of the opinion that the tug captain did all that could have been expected under the circumstances. " . . errors in judgment committed by a vessel put in sudden peril through no fault of her own are to be leniently judged." Union Oil Co. of California v. Tug Mary Malloy, 5th Cir., 1969, 414 F.2d 669, 674.